AO 91 (Rev. 11/11)  Criminal Complaint

SEALED FILED

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

JAN 17 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 1 7 MJ 0 0 0 0 6  BAM |
| Seth Adam Depiano, | ) | |
| | ) | |
| | ) | |
| _____ *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___February 2010 to January 2017___ in the county of ___Fresno and elsewhere___ in the ___Eastern___ District of ___California___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1957 | Money Laundering |

This criminal complaint is based on these facts:

See Affidavit of FBI SA Lori Lubbers, attached hereto and incorporated herein

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Lori Lubbers, FBI Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___1/17/17___

_____
*Judge's signature*

City and state: ___Fresno, California___

Hon. U.S. Magistrate Judge Barbara A. McAuliffe
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Lori Lei Lubbers, being duly sworn, do hereby depose and state as follows:

### Introduction and Agent Background

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2001.   I graduated with a Bachelor of Science degree in Accounting in 1991 and am a Certified Public Accountant and a Certified Fraud Examiner. As part of my official duties, I investigate allegations of violations of federal criminal law, including many allegations of fraud, including high yield investment schemes and real estate investment schemes.

2. I make this affidavit in support of a criminal complaint charging Seth Adam Depiano (hereinafter referred to as Depiano) with mail fraud, wire fraud, and money laundering, in violation of Title 18, United States Code, Sections 1341, 1343, and 1957, in connection with his operation of a fraudulent real estate investment scheme (sometimes referred to as a "Ponzi" scheme) through his companies, The Rental Group, The Realtor Group, US Funding and Home Services, LLC, Depiano Income Property Services, Draymond Homes, and Fidelity National Title Services (hereinafter referred to as Real Estate Businesses), located at relevant times at 1030 Gettysburg Avenue, Clovis, California 93612.

3. As explained by the United States Securities and Exchange Commission (SEC), a "ponzi" scheme is a type of investment scheme named after Charles Ponzi, who duped thousands of investors in the 1920s. Today, a Ponzi scheme is one that works on a "rob-Peter-to-pay-Paul" principle, as money from new investors is used to pay off earlier

1

investors until the whole scheme collapses.

4.  I have learned that Depiano, individually and in his capacity as an operator of the Real
    Estate Businesses, is soliciting money from individuals to lend to Depiano's associates to
    purchase real estate rental properties on some occasions, or to directly purchase real
    estate for their own investment purposes on other occasions.   Depiano and the Real
    Estate Businesses sell property that is different than what the investor believes they are
    purchasing, or, the property does not exist at all. Depiano and the Real Estate Businesses
    are using a ponzi scheme, whereby, funds from new investors are paid out to the initial
    investors as interest or rental income. Depiano and the Real Estate Businesses also pay to
    the investors, sometimes through escrow or immediately after investing, purported
    prepaid rents or interest. Depiano and the Real Estate Businesses also file fraudulent
    grant deeds with county recorders' offices purporting to convey properties out of the true
    owner's name into a witting or unwitting associate's name in order for Depiano to be able
    to purportedly re-sell those properties to other investors.

5.  The facts set forth in this affidavit are based on my own personal knowledge; knowledge
    obtained from other individuals during my participation in this investigation, including
    other law enforcement officers, FBI employees or contractors, interviews of witnesses;
    my review of records related to this investigation; communications with others who have
    knowledge of the events and circumstances described herein; and information gained
    through my training and experience. Because this affidavit is submitted for the limited
    purpose of establishing probable cause in support of the application for a criminal
    complaint, it does not set forth each and every fact that I or others have learned during the

course of this investigation.

6. I have set forth only the facts that I believe are necessary to establish probable cause to believe that Depiano has committed mail fraud, wire fraud, and money laundering in furtherance of and in connection with the fraud schemes described herein.

### General Nature of Real Estate Investment Schemes

7. Based upon my training and experience, I have learned about fraudulent real estate investment transactions. I have learned from my experience that individuals who solicit investors for fraudulent real estate investment transactions make promises as to the condition of the property and even the type of property. For example, an apartment complex for sale, may, in fact, be only an individual condominium for sale. The fraudulent real estate investment representatives also promise higher than average interest and/or rental income returns. These representations attract investors by guaranteeing high interest rates and rental income returns.

8. Promoters of these investments often promise to pay substantial returns to the investors; however, frequently the purported "profits" or "rental income" distributed are merely funds obtained from subsequent victims or a portion of the original investor's investment. In the United States, such a scheme is referred to as a "Ponzi Scheme". In such schemes, little if any income is ever earned from legitimate real estate investments. Ultimately, the investors' funds are dissipated or lost.

9. Ponzi scheme promoters also take or give ownership of a property to others by filing false grant deeds, with fraudulent notarization, at the county recorder's office. This "clouds" the title of the property preventing the true owner from selling their property or

3

taking out a new mortgage or using the properties' equity as collateral. The true owner then has to prove that they did not sell or reconvey the property to others, which, often times, is at great expense to the true owner.

10. In the past, I have assisted on investigations that have identified individuals perpetrating such fraudulent real estate investment schemes, and the perpetrator may also commit affinity fraud or take advantage of people. The perpetrators will find a connection to their victims and earn their trust because of shared interests or similarities, such as sports, religious, or ethnic identities. The perpetrator gains their trust and steals their money.

## Applicable Law

11. [a] Mail Fraud (18 U.S.C. § 1341):   the defendant knowingly and with the intent to defraud devised and intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of materially false or fraudulent pretenses, representations, or promises, and used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

[b] Wire Fraud (18 U.S.C. § 1343):   the defendant knowingly and with the intent to defraud devised and intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of materially false or fraudulent pretenses, representations, or promises, and used, or caused to be used, a wire communication affecting interstate or foreign commerce to carry out or attempt to carry out an essential part of the scheme.

[c] Money Laundering (18 U.S.C. § 1957):   the defendant knowingly engaged in or attempted to engage in a monetary transaction knowingly involving criminally derived

4

property of a value greater than $10,000, which property was, in fact, derived from mail fraud and wire fraud, and which transaction occurred in the United States.

### Summary of Criminal Activity and Statement of Probable Cause

12. As detailed below, Depiano has undertaken, individually and through the Real Estate Businesses, several fraudulent real estate investment schemes, utilizing his bank accounts in furtherance of his commission of mail fraud, wire fraud and money laundering. Depiano used several bank accounts, including: Seth Depiano sole proprietor doing business as US Funding (US Funding Account), Seth Depiano (Personal Account), The Rental Group account (Rental Group Account) and Fidelity National Title Services (Fidelity Account), and others (hereinafter referred to as the Accounts). These fraudulent transactions span several years.

### Depiano Fraudulently Sold DP and CP the North Roosevelt Apartment Complex

13. Investigation has revealed that Depiano defrauded DP and CP of $795,000 by selling them an apartment building located at 5105 North Roosevelt Avenue, Fresno, California (the North Roosevelt Apartment Complex) which Depiano did not own or have the authority to sell. The North Roosevelt Apartment Complex was owned by GR, and sold by Depiano without GR's knowledge.

14. The FBI Investigation was initiated upon receipt of a September 2015 police report from Los Gatos Police Department in which a notary reported that her signature had been forged on a grant deed document. The grant deed, dated in May 2015, transferred ownership of the North Roosevelt Apartment Complex from GR to TM purportedly for $260,000.   The notary showed the police officer her notary book where the notarized

5

document should have been listed and it was not in the notary book. The notary also stated that the signature and writing on the grant deed was not hers. GR reported that she had owned the apartment building on North Roosevelt since 1970. GR advised she had not sold nor grant deeded this property to anyone.

15. The May 2015 grant deed purported to change the ownership of the North Roosevelt apartment building from Fresno Kelsam LLC, a business associated with TM, to the trust of DP and CP. This grant deed was not recorded until September 2015. The mailing address listed for the new owner of the North Roosevelt property was 1030 Gettysburg Avenue, Suite 107, Clovis, California. Affiant has spoken with county recorder's employees who have advised, when documents are recorded, the mailing address listed for the owner is where a copy of the recorded document is automatically mailed to. In this instance, this address is a business address for Depiano and the Real Estate Businesses. The notary identified on the grant deed reported that he did not notarize this document, which was corroborated by TM.

16. On or about May 26, 2015, the purchase of the apartment complex by DP and CP was finalized through North American Title Company Inc. and a wire transfer of $759,437.60 was made by North American Title Company Inc. on behalf of DP and CP to Depiano's US Funding Account (a Bank of America account).   Your affiant attests that this and other Bank of America-related wire transfers referenced herein were interstate in nature based on information provided by Bank of America representatives that wire transfers within Bank of America accounts all are processed outside of California.

6

17. DP reported that Depiano solicited him to purchase investment rental properties in exchange for managing the properties and receiving rental income. DP provided affiant with documents collected during his negotiations with Depiano relating to the purchase of the North Roosevelt Apartment Complex. These documents were received via email from Depiano or U.S. mail/commercial interstate carrier by Depiano using the business address on Gettysburg Avenue. Some email communications from Depiano and/or his associates included attachments of the documents. One document was the "5105 N. Roosevelt Rent Roll Morch *[sic]* 2015" which lists 16 apartment units, identifying each renter by last name and their lease start and end dates. In essence, this document represented 100% occupancy at the North Roosevelt Apartment Complex. Other documents reviewed by affiant included Residential Rental Agreements listing the renter's name and the monthly rent amount, signed by both the renter and the Landlord. The landlord listed was a known employee of Depiano and the Real Estate Businesses.

18. On April 29, 2016, FBI agents conducted an interview of the manager located at the North Roosevelt Apartment Complex. The manager confirmed that no one on the list provided by Depiano to DP was an actual renter at this complex. Depiano's list refers to the apartments numbered 1 through 16, but the actual apartments are numbered 101-108 and 201-208. The rent checks are sent to GR herself, or more recently, a Post Office Box opened by GR to receive the rent checks. The manager did not recognize photographs of Depiano or the property's purported landlord.

19. Also on or about April 29, 2016, FBI agents interviewed two renters at the North Roosevelt Apartment Complex. The rental agreement information provided by Depiano

7

was inconsistent as there was no rental agreement relating to the true renters. One renter had lived there for 30 years and the other renter has lived there for 3 years, both provide their monthly rent checks to GR, the true owner of the complex.

## Depiano Fraudulently Sold DP the Winery Complex

20. Investigation has revealed that Depiano also defrauded DP of approximately $1.7 million by selling him an apartment building located at 1190 South Winery, Fresno, California (the Winery Complex) which Depiano did not have the authority to sell.  The Winery Complex in fact is not an apartment complex, but instead a collection of individually-owned condominium units. In August 2015, DP attempted to purchase the Winery Complex, which he understood based on Depiano's representations to be an apartment complex with 96 units.

21. DP also provided affiant documents related to the Winery Complex purchase.   DP provided copies of email communications with Depiano, who described the Winery Complex as a 96-unit complex. One document reviewed by affiant, was a "Winery Rent Roll July" which identifies each renter by first and last name and the monthly rent amount. Only four (4) units are identified as vacant. This document was mailed to DP by Depiano and/or his associates from the business address on Gettysburg Avenue. In connection with Depiano's solicitation of DP to purchase the Winery Complex, Depiano also gave DP purported profit and loss statements from the then-purported current owner of the Winery Complex, Mat Homes, LLC which is owned by PC, an associate of Depiano. Depiano referred to the profit and loss statements in an email to DP, noting that there supposedly will be a 20% return on this investment.

8

22. Depiano's own escrow company, US Funding and Home Services, handled the closing. On or about August 19, 2015, in connection with closing, DP wired $1,789,869.28 to Depiano's US Funding Account and signed a promissory note in the amount of $2,578,235.

23. Affiant obtained a timeline of events DP authored for the Winery Complex transaction. According to the timeline, Depiano offered to credit 2% of Depiano's commission back to DP prior to closing the Winery Complex transaction. Depiano paid the 2% with a cashier's check dated August 24, 2015 for $88,320 purchased by The Realtor Group and $20,000 cash on or about August 24, 2015. Affiant's review of the settlement statement provided in DP's documents determined this credit was conducted outside of escrow.   In my training and experience, payments made outside of escrow for such transactions typically suggest fraud, i.e. a non-arms length transaction that all of the parties to the transaction should know about.

24. According to DP, after receiving a call from the Los Gatos police department regarding the North Roosevelt Apartment Complex and the forged notary signature, DP asked Depiano for a copy of all of the deeds to the properties he had purchased from Depiano thus far. DP reviewed the grant deed on the Winery Complex which purportedly showed the ownership change from PC, doing business as Mat Homes LLC, to DP. But, when DP double checked with the Fresno County Recorder's Office, the Winery Complex was not in DP's name and he discovered the units are "single condos."   Affiant's investigation revealed that the Winery Complex is not a 96-unit apartment building, that Mat Home

LLC is not the owner of the complex, and that at most PC transferred a single unit to DP (not the entire Complex).

25. Throughout the few months that DP believed he owned the 96-unit apartment complex, DP received "lulling" monthly rental income payments from Depiano.

### Depiano Defrauded PM and DC in an Apartment Building Purchase by SA

26. Investigation has revealed that Depiano defrauded PM, doing business as Muks Realty, LLC, and DC of $275,000 each, totaling $550,000. Depiano brokered a purchase of an apartment building located at 842 Ferger Avenue, Fresno, California (the Ferger Avenue Apartment Complex). The buyer was SA, a relative of Depiano. Depiano solicited loans from PM and DC to provide the funding for this purchase. Depiano told PM and DC that the loans would be collateralized by property. Documents were filed with the Fresno County Recorder's Office, shortly after the purchase, falsely reflecting the loans had been paid off. The property, now without any liens, was then sold to other individuals. To hide the fact that the Ferger Avenue Apartment Complex had been sold, Depiano caused loan payments to be paid to PM and DC for several months.

27. PM provided a written complaint to the Fresno County District Attorney's Office and was subsequently interviewed by affiant. PM indicated that he and DC, Depiano's uncle, were solicited by Depiano to provide funding for SA to purchase the Ferger Avenue Apartment Complex in February 2010 which was evidenced by a note. PM only dealt with Depiano and, in fact, had never met SA. Depiano provided the solicitation material which outlined the sales price and potential earnings.

10

28. PM's complaint included a copy of a document called, "Full Reconveyance", which was filed with the Fresno County Recorder's Office in April 2010. This document purportedly documents that the PM and DC loans had been paid off.   Both PM and DC told affiant that their signatures had been forged on this document.

29. Payments toward the loans continued to be made to PM and DC through 2013. According to PM, Depiano collected and administered these monthly loan payments, even hand-delivering some of the loan payments. Due to this, neither PM nor DC knew that the property had been sold in August of 2010.

30. The Ferger Avenue property, a single-family residence, was sold to three individuals, and the associated grant deed was recorded at the Fresno County Recorder's Office in August 2010 (transferring ownership from SA).

31. On July 7, 2016, affiant interviewed one of the purchasers, who stated she had not met the seller of the Ferger Avenue property as all communication went through the buyer's and seller's real estate agents.   The purchaser's property documents included a pest control report ordered by Seth Depiano.

**Depiano Fraudulently Sold MO Apartment Buildings in Fresno**

32. Investigation has revealed that Depiano also defrauded an individual named MO. MO and his family members purchased numerous rental properties through Depiano, but discovered in 2013 that the properties purchased did not exist and/or were not as Depiano outlined in the purchase agreements.

33. MO's three children each purchased a four-unit apartment building for $165,000 each from the seller, SA (Depiano's relative, involved in a separate fraudulent transaction,

11

described above). MO's children, as buyers of the four-plex apartments, received monthly rental income, less management fees for Depiano's property management services. At some point, the monthly rental income stopped being sent and MO conducted a property title research which revealed his children were not on title. MO questioned Depiano about the results of his search and Depiano blamed a fictitious person from a fake title company.

34. On May 2, 2016, your affiant interviewed a former Depiano employee, who reportedly had witnessed Depiano signing MO's signature on documents.   Depiano reportedly told the employee he had an "understanding" with MO that Depiano could sign MO's name. On May 3, 2016, MO was interviewed by affiant and indicated that he did not give Depiano authorization to sign his name.

35. MO sued Depiano and others civilly and won a judgment of approximately $1.5 million. On or about February 16, 2016, Depiano caused to be wire transferred from his US Funding Account two payments – $400,000 and $500,000 – to MO's attorneys in partial satisfaction of the civil judgment.   Just four days prior to those wire transfers (February 12, 2016), unrelated investors soon-to-be victimized by Depiano (BMO, LLC, discussed below) wire transferred $2,410,000 into Depiano's US Funding Account, enabling Depiano to pay off a previous investor, MO.   Depiano knew that his $400,000 and $500,000 wire transfers, which were conducted in the United States, involved criminally derived property (BMO, LLC's defrauded funds) of a value greater than $10,000.

### Depiano Defrauded Investors of BMO, LLC

36. In April 2016, Seth Depiano solicited a group of investors who ultimately created a

limited liability company (BMO, LLC) to purchase distressed real estate in the Fresno area.   Depiano and the BMO investors agreed to purchase properties and either manage them for rental income or sell (flip) them for profit.   Depiano would assist in selecting the properties, facilitate improving the properties and/or manage the rental properties. Depiano also represented he would obtain title insurance, general liability insurance, and an umbrella policy for each property purchased.   Depiano gave the BMO investors rent roll and projected income documents that showed – often falsely – high occupancy rates with a high rate of return.   Based on these and other false representations by Depiano, from approximately April 2016 through July 2016, BMO invested with Depiano approximately $13 million to purchase real properties as described above.

37. Depiano promised to provide to the BMO investors grant deeds and title insurance documents for the properties they purchased, but did not make good on his promises. Later, the BMO investors discovered that Depiano had misrepresented the title and ownership status of the majority of the real properties he promised to acquire using the investment funds and on behalf of the BMO investors.   The BMO investors also determined that some of the properties Depiano solicited them to purchase did not exist, some properties were purchased twice, and other properties were in such disrepair that the insurance policy was cancelled due to being uninhabitable.

38. In furtherance of his fraud scheme, on or about April 20, 2016, Depiano solicited and caused the BMO investors to wire transfer approximately $1.8 million to a bank account controlled by Depiano, to be used for the purchase of identified real properties.

39. In furtherance of his fraud scheme, on or about July 15, 2016, Depiano transmitted to the

BMO investors by U.S. mail or commercial interstate carrier a cashier's check in the amount of $123,580, purportedly representing the BMO investors' rental income from properties owned by BMO and managed by Depiano.

### Depiano Defrauded JSW

40. In late-May 2016, after having invested previously with Seth Depiano in late-2015 and being paid back his principal with interest, Depiano solicited and caused JSW to make several investment loans to Depiano totaling approximately $5 million. Depiano represented to JSW that the loaned funds would be used to purchase and/or rehabilitate real properties and that JSW would earn a share of the proceeds from Depiano's subsequent sale of those properties. Depiano also represented that each loan would be backed with grant deeds to unencumbered properties or a first position deed of trust. Depiano also promised a 20% return on JSW's money.

41. Some of the properties to be used as collateral were apartment buildings located at 1064 Helm Avenue, 1076 Helm Avenue, 1124 Helm Avenue, and 1136 Helm Avenue, Fresno, California. Affiant interviewed the true owner of these properties, Helm Group LLC, whose principal member is TA. TA advised he was the true owner of the Helm Avenue apartments and he was in the process of selling the apartments. TA advised the title is now clouded due to the fact a grant deed was filed adding Draymond Homes (a Depiano dba) as owner of the property.

42. As discussed in more detail below, Depiano provided a different investor, AS, Helm Group LLC profit and loss statements, bank statements, and a settlement statement for the sale of TA's apartments. Upon review, TA advised affiant these documents were

fraudulent as they were not his profit and loss statements, nor did he use the bank that

was on the bank statements and he had not yet sold his apartments.

43. In furtherance of his fraud scheme, on or about June 2, 2016, Depiano caused JSW to

wire transfer $2,300,000 to an account controlled by Depiano in the name of Draymond

Homes.

## Depiano Defrauded AS

44. Affiant reviewed a chronological report authored by AS, a Clovis Police Report, and

conducted an interview of AS on November 4, 2016. Based on the information learned,

AS was solicited by Depiano on or about September 19, 2016 to invest as a co-

purchaser/co-owner in an apartment complex located at 1064-1136 Helm Avenue, Clovis,

California. Depiano represented to AS that the seller of the apartment complex, TA,

doing business as the Helm Group LLC, was going through a divorce and wanted to sell

the property for $1.2 million in cash, but that Depiano could sell it later for $2.6 million.

Depiano represented he would personally be investing $400,000 to $600,000, but that he

needed additional partners. AS recruited four of his friends willing to invest $100,000

each.

45. On September 22, 2016, Depiano emailed a title report to AS which represented the

apartment complex located at 1064-1136 Helm Avenue, Clovis, California, was free and

clear of all indebtedness and property taxes were paid up-to-date. Clovis Police

interviewed the title officer who prepared the title report and discovered that the title

report Depiano provided to AS was different than the original title report she prepared.

The original title report has several line items showing the property was encumbered with

15

debt, and, in fact, Depiano and Seth's Future LLC, a Depiano organization, had encumbered the property with $6 million in debt.

46. AS received multiple emails from Depiano on or about September 23 through 28, 2016. These emails contained Helm Group LLC profit and loss statements, bank statements, rent rolls, comparison information, and an appraisal. On November 8, 2016, affiant interviewed TA. TA reviewed the documents that Depiano provided to AS and advised they were not his documents and were not representative of his Helm Group LLC business activities. On November 8, 2016, affiant interviewed the appraiser, who advised there were several issues with the appraisal: the email and telephone numbers were not correct, the information was not filled out correctly, and it appeared that the appraisal was from an earlier appraisal he had conducted for Depiano on a different property.

47. On or about October 4, 2016, Depiano emailed wire instructions to AS who forwarded on the information to the other individuals interested in the investment opportunity offered by Depiano. Depiano also told AS that the escrow officer would be contacting AS when the escrow was open. Pursuant to the wire instructions provided by Depiano, the money was to be wired to a Citibank account in the name of Fidelity National Title Services. This account was opened on or about September 19, 2016 by Depiano.

48. Later on October 4, 2016, AS was contacted by the purported escrow officer who advised the escrow was open. On October 5, 2016, two investors solicited by AS, who both attempted to wire $100,000, were contacted by their banks advising the bank stopped the wire transfers because there was a discrepancy with the escrow number. One investor successfully wired his $100,000 investment.

49. AS contacted the title company who informed him the escrow number did not exist and that there was no title officer by the name that Depiano gave to AS.

50. Bank analysis shows that the $100,000 was wire transferred into the Fidelity National Title Services Citibank account opened by Depiano as the sole owner on September 19, 2016. On that same day, there was a cash withdrawal from the account of $8,320 at Harrah's Casino. Bank analysis reveals that Depiano frequents numerous casinos inside and outside California.   On or about October 7, 2016 there was a $20,000 wire transfer out of Depiano's Fidelity National Title Services bank account to The Northern Trust Company, an account for the benefit of LR, another victim of the Seth Depiano fraud scheme.

### Depiano's Other Attempts to Defraud Others

51. Affiant learned from a complaint filed with the Fresno County District Attorney's Office that on or about December 2, 1016 Depiano impersonated a childhood friend to get a document notarized in Las Vegas, Nevada. The document was a grant deed wherein Depiano signed the friend's name as the president of Draymond Homes LLC. The notary, IS, asked to see documentation/proof that he was the president of Draymond Homes LLC. Depiano said he had the documentation in his car. When the notary was busy with another transaction, Depiano took the notary stamp. Video surveillance was shown to a person closely acquainted with Depiano who identified the person as Depiano with hair. Per the most recent DMV photo and from affiant's personal observation, Depiano usually is bald and has no facial hair.

52. The very day Depiano misappropriated IS's notary stamp (December 2, 2016), it was

17

used in connection with another attempted fraudulent transaction.   Specifically, IS's stamp was used on a Deed of Trust in an escrow transaction involving a purported attempt by RY to obtain a $650,000 loan on his personal residence.   A representative of the escrow company involved stated that the escrow company contacted RY because of some discrepancies in the transaction.   RY reportedly stated he was not seeking a loan collateralized by his personal residence.

53. IS informed the FBI after reviewing a copy the Deed of Trust purportedly signed by RY that he did not in fact notarize the document and that the writing on the document was not his.   Based on my experience in this investigation and the timing of the use of the notary stamp on the same day Depiano misappropriated it, I believe Depiano attempted to obtain a large sum of money through a fraudulent escrow transaction.

54. On December 20, 2016, affiant spoke to two investors of BMO, LLC (discussed above).   They reported that a title company representative contacted them to report that she received emails from a person posing as one of the BMO investors.   According to the title company representative, the emails she received concerned a $500,000 refinancing transaction using four real properties as collateral. The purchase money for the transaction purportedly was to come from an identified hard money lender with whom the title company representative was familiar due to her earlier work with him.   The imposter also provided the title company with a purported BMO resolution signed by the BMO investors.   The BMO principal members reviewed the resolution and reported that the signatures were forged and the document fraudulent.   Based on Depiano's prior relationship with and defrauding of the BMO investors, his access to BMO records, and

his knowledge of real estate transactions, your affiant believes that Depiano was the imposter who attempted to defraud the title company.

55. On January 6, 2017, one of the BMO investors reported that a named individual contacted representatives of the property management office for BMO-owned properties regarding his supposed pending purchase of five BMO-owned properties.   The property management representatives knew the five properties were not for sale, but the interested purchaser stated he recently had signed contracts to purchase the five properties and was in Fresno to view the properties.   The interested purchaser stated he was waiting for Seth (Depiano) who was going to facilitate access for the interested purchaser to one of the properties. Based on this information and affiant's experience in this investigation, Depiano is continuing his efforts to obtain money by fraudulent means.

**Depiano is a Flight Risk and Poses an Economic Danger to the Community**

56. In May 2016, affiant executed search warrants at Seth Depiano's residence and at the Real Estate Businesses office, and also executed a seizure warrant for funds from three of Depiano's business and personal bank accounts. In spite of these overt law enforcement interdictions in May 2016, as discussed above, Depiano has continued to repeatedly solicit and defraud investors and others as described above, including as recently as January 2017 (discussed above).

57. Moreover, one of Depiano's family members reported that Depiano visited him/her in late August 2016 (approximately three months after the FBI executed search and seizure warrants, discussed above) carrying two large suitcases.   Depiano told the family member that he was entering the witness protection program and would be traveling to

19

Chicago and Philadelphia to meet with the FBI. Your affiant is aware that Depiano is not involved with the FBI in any witness protection program.   Depiano told the family member he would not be seen for a while.   The family member reported that Depiano has traveled to Mexico in the past.

58. A person with knowledge reported to your Affiant that Depiano cancelled his membership at a Fresno country club in October 2016 and has heard rumors Depiano had informed other associates that he was leaving and not coming back (further suggesting Depiano is making preparations to flee or evade law enforcement).

## Conclusion

59. Based on the investigation to date in this case, and on my training and experience, there is probable cause to believe that Seth Depiano has knowingly and with the intent to defraud devised and intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of materially false or fraudulent pretenses, representations, or promises – including false representations that he purchased and/or managed on behalf of investors real properties, when in fact the properties may not even have existed or were uninhabitable – and used, or caused to be used, the mails and wire communications to carry out or attempt to carry out an essential part of the scheme.   In connection with his fraud scheme, Depiano also knowingly engaged in or attempted to engage in a monetary transaction knowingly involving criminally derived property of a value greater than $10,000, which property was, in fact, derived from mail fraud and wire fraud, and which transaction occurred in the United States.   For the reasons set forth

below, there are also reasonable grounds to conclude that Depiano poses a risk of flight

and is likely to continue to economically harm the community.

Lori Lei Lubbers
Special Agent
Federal Bureau of Investigation

Approved as to form:

___/s/ Christopher D. Baker___
Christopher D. Baker
Assistant United States Attorney

Subscribed and sworn to before me this ___1 7___ day of January, 2017.

The Honorable Barbara A. McAuliffe
United States Magistrate Judge

21